Laurent R.G. Badoux, AZ Bar No. 020753
LBadoux@Buchalter.com
BUCHALTER
16435 N. Scottsdale Rd., Suite 440
Scottsdale, Arizona 85254
Telephone: (480) 383-1800
Facsimile: (480) 824-9400
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Josephine Tijerino,<br><br>Plaintiff,<br><br>v.<br><br>Stetson Desert Project LLC d/b/a Le Girls Cabaret, Cory J. Anderson, and Cary Anderson,<br><br>Defendants. | Case No. 2:15-CV-02563-SMM<br><br>(Consolidated with Case Nos. 2:15-cv-02564 and 2:16-cv-00408<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Tamicka Toliver,<br><br>Plaintiff,<br><br>v.<br><br>Stetson Desert Project LLC d/b/a Le Girls Cabaret, Cory J. Anderson, and Cary Anderson,<br><br>Defendants. | |
| Jane Roe Dancer,<br><br>Plaintiff,<br><br>v.<br><br>Stetson Desert Project LLC d/b/a Le Girls Cabaret, Cory J. Anderson, and Cary Anderson,<br><br>Defendants. | |

Defendants Stetson Desert Project LLC d/b/a Lé Girls Cabaret, Cory J. Anderson, and Cary Anderson, by and through counsel, hereby submit their Motion for Summary

Judgment. At this juncture of the consolidated cases, all Plaintiffs, with the exception of Jane Roe Dancer 2 ("Remaining Plaintiff"), have been dismissed from this action upon a settlement, or, in the case of Plaintiff Tijerino, a request for dismissal, all of which were submitted to the Court for review and approval.

## I. INTRODUCTION

Three lawsuits brought in 2015 and 2016, involving six individual claimants, were consolidated in this Court. The Court denied Plaintiff's request for collective action certification in December 2016, and asked for briefing on the issue of whether lead Plaintiff and other claimants were independent performers or employees. The Parties completed three depositions and exchange of documentary evidence. Following extensive briefing and submission of supporting evidence by Defendants, the Court dismissed the matter. Plaintiffs appealed and the case was remanded. Following a Rule 16 conference, the Court entered a new case management order, which provided, inter alia, that the parties had to complete discovery on or by June 12, 2020. The Parties requested a 10-day extension for completion of depositions and exchange of documents until June 22, 2020. Remaining Plaintiff's deposition was duly scheduled for June 19, 2020, to be taken remotely to minimize COVID-19 transmission risk. On June 18, 2020, then counsel for Jane Roe Dancers informed the undersigned that Jane Roe Dancer 2 had not been communicative and did not indicate she would appear for her deposition the next day, which she did not, as attested to by the attending court reporter. Subsequent efforts this month to engage the Remaining Plaintiff via phone and mail proved unsuccessful.

The record remains limited to the same information available to the Parties and previously presented to the Court in briefing on the issue of applicability of the Economic Realities Test under the FLSA. Given the timing of Remaining Plaintiff's failure to appear at her deposition, Defendants set forth reasons why the Court should dismiss this lawsuit as a matter of law under Rule 56, or as a matter of sanction within the Court's discretion under Rule 37.

As previously indicated to the Court, Defendants sought the ability to conduct the

depositions of all Plaintiffs, starting in 2016 and had noticed such depositions in a timely fashion but Plaintiffs' counsel's schedule precluded these depositions from occurring in January or June 2017. The unavailability of the Jane Roe Dancer Plaintiffs, including Remaining Plaintiff, is not a matter of Defendants' lack of effort to secure such testimony, but rather an unwillingness of the Plaintiffs to subject themselves to examination.

Based upon the available evidence, however, Defendants maintain, as they have throughout this lawsuit, that Remaining Plaintiff (or any of the Plaintiffs for that matter) cannot establish she was an employee under the applicable FLSA standards.

## II. LEGAL ARGUMENT

### A. Plaintiff Is An Independent Performer Under The Economic Realities Test And Is Not Covered By The FLSA.

The Economic Realities Test applies to assess whether an individual is legally an employee under the Fair Labor Standards Act (FLSA). *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754-755 (9th Cir. 1979) (adopting six-factor test). Although Remaining Plaintiff has argued throughout this case that a nationwide wave of lawsuits filed against "gentlemen's clubs," as the term is sometimes used, supported the position that she was an employee, it became clear that the unique policies in place at Defendants' venue ("Lé Girls") were vastly different than those analyzed in other decisions. Because this case is unique, reliance upon other industry decisions, though instructive, cannot be dispositive, whether the decision supports a finding of employee or independent contractor status. *Compare Hillborn v. Prime Time Club, Inc.*, No. 4:11CV00197 BSM, 2012 WL 9187581 (E.D. Ark. July 12, 2012) (finding exotic dancer to be independent performer) with *Clincy v. Galardi S. Enters, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. 2011) (finding exotic dancers that were subject to extensive house rules to be employees).

Understandably, most of the selected targets of these lawsuits were clubs that imposed extensive controls over entertainers, a factor that is conspicuously absent here. This stark difference is best exemplified by contrasting the facts of the *Clincy* decision

with the realities of the relationship between Lé Girls and performers including Remaining Plaintiff. In *Clincy*, the club ("Onyx") required entertainers to adhere to a detailed set of "Rules of Conduct" or face discipline (for which Onyx had forms called corrective action forms) in the form of suspensions and fines: adhering to a schedule, calling in sick with enough notice and with proof of incapacity to perform; refraining from appearing at other clubs, meeting Onyx's physical and grooming standards before appearing, committing to appear at least four times per week and appear on a minimum numbers of "slow days;" reporting on time; refraining from leaving early or without completing Onyx's check-out procedure; refraining from bringing outside food; changing appearances or dance routine at management's request; allowing tips for all dancers appearing on stage to be collected by management; reporting all tips earned to management; agreeing to random drug testing. 808 F. Supp. 2d at 1330-36. *See also Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) (relying upon an even more exhaustive list of rules through which Rick's Cabaret controlled the work of entertainers). Lé Girls applied none of those rules that appear prevalent at many of the clubs that have been embroiled in similar lawsuits.

Thus, no matter how many decisions Plaintiff's counsel have enumerated over the course of this action, it is undisputed that each case stands on its own merit in the application of the six-factor test, and that the realities of the relationship between Lé Girls and licensed entertainers like Remaining Plaintiff are unique to this establishment.

The Economic Realities Test presents six (6) factors. Factors that shed light on Remaining Plaintiff's status as an independent performer are:

1. The degree of control the alleged employer exercises over the individual;
2. The individual's opportunity for profit or loss;
3. The individual's investment in the business;
4. The degree of skill required to perform the work;
5. The permanence of the working relationship; and
6. The extent to which the work performed is an integral part of the alleged employer's business.

*Real*, 603 F.2d at 754-755; *see also* A.A.C. R20-5-1205 (promulgated through 13 A.A.R. 4315). The uncontroverted evidence demonstrates that the test overall confirms the existence of an independent relationship between Club and Remaining Plaintiff.

**1. Absence of Control Over Performance.**

As the Court previously noted in its earlier ruling, the presence or absence of control over a person looms large in this analysis. The reality of the relationship between the Club and individual licensees is that the Club exercises virtually no control over them. *See* Deposition of Corporate Defendant's 30(b)(6) representative, Joshua Thornton ("Thornton Depo.") at 141:11-24 ("Q: "Is it your testimony that the Club has no control over […] the flow of—time in which [any dancer] shows up to work in a given workweek? A: Yes") (noting also that the Club never sends a dancer home because there are too many on site), excerpts from which are attached hereto as Exhibit B. The following undisputed facts demonstrate the utter absence of control by Defendants:

- Dancers, including Remaining Plaintiff, signed a License Agreement that spells out their right to use the premises of the Club for the purpose of performing erotic dancing; that agreement memorializes that the dancer is an independent performer, not an employee. A Sample License Agreement was used during Thornton Deposition (as Exh. 8). It is referred to herein as the "License Agreement." A copy is attached hereto as Exhibit A.
- The Club maintains no schedule for dancers; each dancer is free to appear at the Club when and for however long (sometimes as long as the Club is open) or little (sometimes as short as a few minutes, if the Club is busy or the dancer immediately earned the amount of money she was looking to earn) the dancer pleases. Thornton Depo. at 142:21-144:10; 171:21-172:8.
- Defendants' records show that Remaining Plaintiff, who performed under the name Bria, appeared only a handful of times at the Club and always at different times, and negotiated a reduced license fee on several occasions. See Exhibit E hereto (Defs 100-107).

- Dancers are free to perform however they choose at the Club; there is no rule for how to dance or how to interact with patrons, besides those that the City of Phoenix imposes upon erotic dancing, within the confines of the First Amendment, which protects dancing as a form of constitutionally protected expressive speech. Thornton Depo. at 147:2-150:1.
- Dancers are free to leave the premises at any time, free to take a break on site, eat, go outside to smoke a cigarette, place phone calls, have a drink or sit at the bar. They do not have to provide an excuse or reason for the decision to leave the establishment. *See* Deposition of Josephine Tijerino ("Tijerino Depo.") at 81:15-82:9, excerpts from which are attached as Exhibit C; Thornton Depo. at 175:3-176:6.
- Dancers are free to dance at other establishments, which many do or did, including original Plaintiffs Tijerino and Toliver, who admitted dancing at multiple clubs simultaneously. License Agreement at ¶9.2; Tijerino Depo. at 21:25-27:8; Deposition of Tamicka Toliver ("Toliver Depo.") at 34:23-35:10 (understanding she was free to appear at any club even while still licensed at Lé Girls); 64:3-16 (auditions), excerpts of which are attached hereto as Exhibit D.
- Dancers are free to take long hiatus from appearing at the Club. As Plaintiff Tijerino testified, she went sometimes weeks or months in between appearances at Lé Girls, while appearing at other clubs in Arizona or out of state. Toliver appeared at three separate clubs (Lé Girls, Fox's and Xecutives), Toliver Depo. at 34:23-35:10, and auditioned at two more (Christie's and Jaguars). Toliver Depo. at 64:3-16. Tijerino appeared at more than 10 separate clubs (Eden, Curves, Great Alaskan Bush Company, Hustler's, Spearmint Rhino (Los Angeles and Las Vegas), Lé Girls, Bombshells, Christie's, and three other locations in San Diego and metro Los Angeles that she could not recall). *See* Tijerino Depo at 19:12-27:8 and

84:10-23. Similarly, Defendants only have records for Remaining Plaintiff appearing at the Club on six occasions over the course of 14 months (February 2014 to April 2015).

- Club management did not (and could not) discipline or fine entertainers for non-compliance with any Club rules, because the Club did not actively maintain any set of rules for dancers and did not control what they earned from appearances. Thornton Depo. at 128:11-130:15 (identifying no posting or flyer used to communicate rules to dancers) and 146:25-147:1.
- Dancers can dance on either the fully-nude or topless side of the Club. Plaintiff Tijerino appeared on both sides of the Club, and Defendants believe that is true of many other dancers. Tijerino Depo at 59:9-12.
- Dancers receive no wages from Defendants and never have in the decades that the establishment has been in operations. *See* License Agreement ¶8.4; Thornton Depo. at 128:1-9.
- The Club does not control or monitor what dancers receive in gratuities nor report to taxing authorities. See License Agreement at ¶¶7.2.7 & 7.2.8.
- The Club does not dictate how much a dancer can or may charge a patron for a dance anywhere else in the Club except in the VIP area. Thornton Depo. at 133:8-135:10 (Club suggests an industry standard of $10 to $20 per song, depending on area of the floor but dancers are free to set a different rate with a client; none of the monies dancers collect are monitored or accounted for by the Club); *see* Toliver Depo. at 76:2-8.
- Dancers are free to use, or refrain from using, any of the areas made available at the Club, meaning that Remaining Plaintiff had no obligation to appear on stage, could use any area within the Club, and was not obligated to dance at all. Indeed, dancers are free to simply hang out with a patron and receive whatever gratuity or beverage the patron is willing to provide the dancer without any performance. Thornton Depo. at 172:2-8.

In prior submissions, Plaintiffs asserted that Defendants controlled them generally because of (a) the physical layout of the Club; (b) management's monitoring of the use of the VIP area; and (c) the rotation of dancers appearing on stages. The reality is that none of these three elements represents control of any kind over the independent performer.

First, each dancer is free to use any part of the Club the dancer sees fit. Toliver preferred not to use the VIP areas so that she could collect monies from her performances directly from patrons without going through the Club for collection of a VIP fee even though she could make more per dance in the VIP areas. Toliver Depo. at 98:20-100:4.

Second, VIP areas create a personalized environment in exchange for an additional cost to the patron for use. Because costs can be substantial, the Club collects payment upfront, often via credit card. The Club pays the bulk of collected fees to the performer at the time of her departure, but the dancer could collect cash upfront herself as well. Whether a dancer uses the VIP areas and for how long, is up to her; how much time the patron wants to spend in the VIP areas is up to the patron and the dancer accompanying that patron in the VIP area. Thornton Depo. at 154:17-158:9. Again, a dancer has no obligation to dance for any patron and can actually elect not to dance at all, but simply provide companionship. According to Remaining Plaintiff's documents, she used the VIP area at least once but not on other occasions when she appeared at the Club.

Third, as represented in the License Agreement, Remaining Plaintiff was free to participate or refrain from participating in the main stage rotation. Thornton Depo. at 117:11-118:21. The dancer does not have to provide a reason for it and can take her name out of the rotation whenever desired, or have it placed in the rotation whenever desired. The rotation is obviously designed to allow equal time for all the performers that wish to appear on the main stage to showcase themselves and their dancing to the entire Club.

These elements are not indicia of control at all. They certainly demonstrate how much different the management of the Club was in contrast to many of the other venues described in the cases Plaintiffs enumerated previously. When evaluated objectively, the policies at the Club evidence the freedom that Remaining Plaintiff enjoined at the Club. It

would be losing the forest for the trees to claim that individuals that can come and go at their leisure, perform (or refrain therefrom) in any manner they see fit while at the Club (within the bounds of what is allowable by law, of course), apply their trade at other venues freely, never place their name on a schedule, never be bound by a personnel handbook or a set of employment policies and never be trained, fined or disciplined are employees. As the Court of Appeals for the Seventh Circuit indicated in another employment classification case, sometimes the answer is so obvious that application of a test designed to assist in the decision-making process is unnecessary. *See Callahan v. City of Chicago*, No. 15-1318, 2016 U.S. App. LEXIS 2667 (7th Cir. Feb. 17, 2016) (eschewed the Economic Realities Test analysis finding that taxicab drivers were clearly independent operators not employees of the City of Chicago under the FLSA).

As the Court previously determined, this most crucial factor weighs heavily in favor of finding that the dancers were independent performers and not employees. Even if less probative factors may tend to support the opposite view, they cannot overcome the overwhelmingly clear conclusion that Defendants did not control Remaining Plaintiff.

**2. Licensees Have an Opportunity for Profit and Loss.**

Remaining Plaintiff had a significant opportunity for profit and loss. Remaining Plaintiff always maintained a presence in Las Vegas and had no obligation to appear consistently at a gentlemen's club in Phoenix, let alone Lé Girls. In fact, Defendants' records show she did not appear at the Club frequently. Exh. F. It is undisputed that dancers are free to determine what they will accept from patrons for performing, when they will perform, how they will perform, and where they will perform. Specifically, when a dancer appears at a Club often determines the volume of patrons she will encounter. Patrons are the ones that determine whether they will frequent a gentlemen's club and when. Lé Girls has no more say in the matter than the dancers. Dancers may have more say in the matter because dancers with a regular clientele can often contact such regulars in an effort to get them to come and watch them perform, or schedule their Club appearances at time when they know their regular(s) will be at the Club.

In prior papers, Plaintiffs have argued that they did not control Club operations. Although true, there is no absolute requirement for such control under the Economic Realities Test. An entertainer does not have to have full control of a performance venue to be independent. First, dancers, by their choice of where they perform, certainly have a say in the overall operations of the Club. There are dozens of other clubs in the greater Phoenix area that Remaining Plaintiff could have chosen besides Lé Girls. Remaining Plaintiff, as any performer, was free to require payment in advance and at any rate she sees fit. No one at Lé Girls controlled Remaining Plaintiff's discussions with patrons. In fact, the Club does not control the volume of customers in the Club. Entertainers with established clientele are more apt to drive patron traffic than the Club.

Patrons can pay cash for the entertainer's time. Patrons and entertainers are free to and use the Club's credit card terminal if they wish to use their credit cards, and are certainly free to obtain a cash advance on their credit card to make cash payments in the Club. Dancers are free to reach any arrangement they may want with patrons both in the VIP areas of the Club and elsewhere on the premises, including requiring advance payment. Thornton Depo at 159:20-25. Further, when Defendants remodeled Lé Girls in 2014, dancers had input on the rates for VIP area entry. Thornton Depo at 121:6-19.

As opposed to other clubs in reported decisions, such as Onyx or Rick's Cabaret, dancers at Lé Girls are free to appear at other venues. *See* License Agreement at ¶9 ("Performer is free to perform at any other adult entertainment venue, including while she is performing at Lé Girls…"). Because they are not tied to any particular venue, the proper analysis should relate to whether they, as performers, have the opportunity for profit or loss regardless of where they elect to appear. Indeed, that is the case.

It is undisputed that Remaining Plaintiff was responsible for the cost of her license, both in Phoenix and in Las Vegas, dancing outfits and shoes, makeup and personal grooming products, transportation and appearance fees. Although the risk of loss is less than Lé Girls, in pure economic terms, the impact of the risk each dancer takes is significant in relation to each dancer's investment. It is paternalistic and result-oriented to

belittle the investments and risks that confront individual dancers by comparing them to the Club's more substantial investments and risks, as measured in raw numbers only. The reality is that a dancer's risk of finishing a performance with less money than before is quite substantial in both economic and personal terms (as dancing naked or virtually naked in front of strangers is by no means the easy feat that the litigants cavalierly claim). Thus, although the Club's investment is greater than Remaining Plaintiff in pure monetary value, the investment and risk in relation to each party's financial capabilities is not dissimilar and no less material to each party respectively.

Dancers, including Remaining Plaintiff, are free to keep a list of regular clients and use their time in any way they see fit. Tijerino Depo. at 77:20-79:9. How much and to what activities dancers allocate their time are crucial aspects of their ability to make a profit. A dancer faces the risk of losing money on any given outing if she does not manage her time well or does not have regulars to call on. Much as the Club demands no commitment of any kind from a dancer, the Club offers no guarantee of earnings to dancers. Indeed, the Club markets itself equally to dancers and patrons. As original claimant Tijerino stated, she continued to perform at Lé Girls on and off for several months because she enjoyed the atmosphere of the Club, even though she had to drive approximately 120 miles to get to Lé Girls from Tucson or even more when coming from California. Tijerino Depo. at 19:12-28:8 and 84:10-23.

**3. Relative Investment.**

Defendants recognize that operating the Club requires outlay of various costs for a venue that generates approximately $1.5 million in gross annual revenue. The Club does not have to pay rent as one of the Defendants owns the premises, as opposed to many other venues that have been sued for similar claims. Further, Remaining Plaintiff provided no earning or tax record, although she was requested to make it available for inspection at her deposition, which she did not attend. By failing to provide this data, Remaining Plaintiff has failed to meet her burden and the Court should find that this factor is either neutral in the analysis or supports Defendants' position.

**4. Special Skill Set.**

As Joshua Thornton, 30(b)(6) representative for corporate Defendant, testified, Defendants do not maintain a standard of beauty or attractiveness that dancers must meet or maintain. Whether dancers can be successful erotic entertainers is a natural skill that they possess or develop and refine over time. Adult Cabaret Performers must be licensed and profess their knowledge of the rules and regulations that the City of Phoenix imposes upon them. Dancers at Lé Girls are free to perform any physical dance or routine they want in compliance with those regulations. How a dancer adapts to that level of freedom, dances and interacts effectively with a wide range of patrons, and excels at entertaining most of them is an undeniable skill set. Similarly, the ability to connect with patrons and get paid in exchange for entertainment is a skill that goes unrecognized in many of the discussions on this issue in most cases on the topic. It is true, as this Court noted, that previous decisions have generally found the skill set involved in being an entertainer as nominal. The Court has also recognized, accurately, that this factor is usually of nominal impact on the analysis, and was no impediment to this Court's earlier decision or in finding that taxi drivers were not employees. See *Iontchev v. AAA Cab Inc.*, No. CV-12-00256-PHX-ROS, 2015 WL 1345275 at *4-5, *7 (D. Ariz. Mar. 18, 2015), aff'd No. 15-15789 (9th Cir. Mar. 27, 2017) (Memorandum Opinion).

Nevertheless, Defendants continue to maintain that the skill set involved is often downplayed. Plumbers, electricians or standup comedians may not require extensive training to enter their line of work (or even a license), and only the comedian's activities would be protected by the First Amendment, yet many of us lack the skill set to do their work, yet these vocations are deemed to possess special skills. The same supports considering erotic entertainment as a special skill worthy of recognition under this prong.

**5. No Permanency in Working Relationship.**

Dancers are inherently mobile and frequently elect to dance at multiple clubs. Remaining Plaintiff has had residency and has danced in Phoenix and Las Vegas. Original claimant Tijerino exemplified this mobility, testifying that she appeared at well

over a dozen clubs throughout Arizona, California and Nevada. She would club hop from location to location, often alternating between venues or appearing at multiple venues during a similar timeframe. As courts have generally recognized, mobility is the anti-thesis of an employment relationship. *See Clincy*, 808 F. Supp. 2d at 1348. Because Remaining Plaintiff had no obligation to be exclusive to the Club, this factor weighs strongly in favor of non-employee status.

**6. Relevance of Entertainers to the Venue.**

Defendants recognize that performers are relevant to its operations. The Club markets itself both to patrons and to performers as a comfortable and attractive venue. Because they are not employees, dancers are free to consume alcohol on the premises of the Club (alcohol is allowed on the topless side) and they are consumers of the Club's services. Lé Girls is very much like a music venue. It undeniably caters to both musical acts and patrons, and musical acts are part and parcel of the venue experience. Yet, the musical performances are not within the control of the venue. As a result, the music venue is not an employer to the musical acts that perform on its premises, even if they are frequent performers. Similarly, Defendants contend that this factor is neutral in the analysis and certainly too tangential to be dispositive of the issue.

**7. Overall Considerations.**

Remaining Plaintiff provided no evidence that Defendants imposed control over her at the Club. She and other performers, as Tijerino and Toliver demonstrated in their testimony, were free to appear at any venue of their own choosing which markedly decreases her argument that dancers are not "in business for themselves." Indeed, Remaining Plaintiff was not like a server and bartender dependent on someone else's business to earn a living. This argument conveniently glosses over the most fundamental element of this analysis of economic realities: what employer would tolerate that its wait staff would come and go as they please, without schedules or time commitments, without any rules controlling their performance, without disciplinary processes and without supervision from managers? The answer is obvious: no employer would allow such a

state of affair. The reason is equally obvious in that an employer without workplace rules could not ensure that its employees deliver the requisite product to its clients. Here, the Club is Defendants' product, and patrons and dancers alike are the Club's clients. If the Club does not deliver the proper atmosphere, entertainers do not come to perform and patrons do not come to watch them. Within the protection of the First Amendment and the regulations promulgated by the City of Phoenix, Defendants provide a venue where Plaintiff and other dancers elected to perform on their own terms and at their choosing.[1]

In this situation, the Economic Realities Test, regardless of its value in other settings, confuses the issue by setting up tangential inquiries that serve more to obfuscate the reality than clarify it. Here, the Club is a venue where independent performers can showcase their unique and highly-regulated trade, namely erotic entertainment, and patrons can come to enjoy their performances. A performance venue that does not control the performers that appear there, whether they be musical acts, burlesque shows, standup comedians, or other types of performances, does not employ the performers. Performers earn money based upon the quality of their performance. This is why Lé Girls enters into a license agreement with dancers, so it is clear between the parties that performers are merely paying for the right (or temporary license) to perform at the venue, a venue which is itself duly licensed to allow the highly regulated type of entertainment dancers provide. As Judge Silver found in *Iontchev*, where the first two factors of the Economic Realities Test overwhelmingly support the independent contractor model, that the remaining factors are neutral or even nominally suggestive of an employee relationship, the balancing of the factors lead unequivocally to a finding that the claimant is an independent licensee, not an employee. *Id*. at *5-6.

**B. Discovery Sanction**

Remaining Plaintiff did not appear at her properly scheduled deposition. See Affidavit of Court Reporter is attached hereto as Exhibit F. Defendants requested on three

---

[1] This is not to say that the Club could not operate in a different fashion, with entertainers appearing solely on stage, such as in burlesque acts.

separate occasions to depose Remaining Plaintiff. On the first two occasions, in January and June 2017, Defendants agreed to postpone the deposition at opposing parties' request in conjunction with other activities in the case. As the close of discovery approached, Defendants asked for alternate dates for depositions of the Plaintiffs by and through counsel. To accommodate schedules, production of information and settlement discussions, the Parties agreed to extend the discovery deadline to June 22. This Court approved this request. Counsel for the Parties coordinated deposition times for witnesses on June 18, 19 and 22.

On or about June 18, 2020, Plaintiffs' counsel informed Defendants that Remaining Plaintiff had not responded to inquiries from counsel and could not confirm whether she would be appearing at her duly noticed deposition. Counsel for Plaintiffs entered into a settlement on behalf of the other Jane Roe Plaintiffs and moved to withdraw from representation of Remaining Plaintiff immediately before her deposition was set to go forward. At the time set for her deposition, Remaining Plaintiff neither showed up nor attempted to contact Defendants' counsel to secure an alternate deposition time. See Exhibit E.

On or about July 14, 2020, Counsel for Plaintiffs provided contact details for Remaining Plaintiff to the undersigned, who attempted to contact her on July 14 and 15 via phone. Undersigned counsel was unable to reach her (or to leave a voice mail for her) via either call. On July 17, the undersigned sent Remaining Plaintiff a letter asking for a response and warning her that Defendants would be requesting dismissal of the lawsuit. To date, Remaining Plaintiff has not participated in this lawsuit personally since her counsel withdrew or in response to the undersigned counsel's inquiries.

Under Rule 37, a litigant who fails to appear at her properly scheduled deposition is subject to sanction by the Court, including dismissal of the action. Fed. R. Civ. P. Rule 37(d)(1)(A)(i). This matter has been pending for over four years and Remaining Plaintiff was noticed for deposition three times and never appeared. Although the first two depositions were withdrawn at the request of Plaintiffs' counsel, Remaining Plaintiff was

certainly as aware as any litigant that appearing at her deposition was a foreseeable element of prosecuting her claims. The other three Plaintiffs were scheduled for depositions and prepared to attend had they not reached a compromise on their claims.

Although Rule 37(d) sanctions for non-attendance may be avoided, no exception applies here. Specifically, Plaintiff did not challenge the scheduling of her deposition or appear to object to said deposition. *See In re Air Crash at Taipei Taiwan*, 2002 U.S. Dist. LEXIS 466, 2002 WL 32155477 (C.D. Cal. 2002); and *Estrada v. Rowland*, 69 F. 3d 405, 406 (9th Cir. 1995) (dismissal sanction not applicable if Plaintiff appears but does not participate in the deposition in good faith). Simply put, Remaining Plaintiff has no excuse for not appearing at her properly scheduled deposition. Other co-plaintiffs were able to participate in their respective depositions, as were Defendants' witnesses.

Furthermore, the deposition as scheduled allowed Remaining Plaintiff to attend remotely from any convenient location with an internet connection. She could literally have participated in the deposition from her place of residence. Consequently, there is no justification to Remaining Plaintiff failure to appear or respond to inquiry by her lawyer and undersigned counsel even after being informed dismissal could ensue.

At this particular point, all of the initial litigants have either reached a compromise or withdrawn from the case altogether; Remaining Plaintiff is the lone party-plaintiff in this action, yet has neither participated in discovery with her legal representative nor taken any step to participate *in pro se*. Under the circumstances, Plaintiff's failure to appear at her duly scheduled deposition and to become personally involved in this matter in any meaningful way require the imposition of sanctions pursuant to Rule 37, which may include dismissal. *See National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (finding that sanction of dismissal is within the Court's discretion); *Buchanan v. Bowman*, 820 F.2d 359 (11th Cir. 1984) (plaintiff's failure to appear at deposition, respond to discovery, or make arrangements for discovery warranted dismissal of action under Rule 37). The Ninth Circuit has generally given significant deference to the "district court's discretion to issue sanctions under Rule

37(c)(1)" in significant part because that provision in the rules "is a recognized broadening of the sanctioning power." *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). Defendants contend that, had she appeared for her deposition and provided her tax and earning records as duly requested, Remaining Plaintiff would have been forced to corroborate the testimony already adduced and described in this Motion. Should the Court elect not to dismiss the matter for failure to appear at deposition, the Court has the authority to fashion an appropriate discovery sanction under Rule 37(b). At the very least, Remaining Plaintiff must be precluded from the ability to adduce any new information and facts presented by Defendants in this motion should be deemed uncontroverted. *See R&R Sails Inc. v. Insurance Co. of the State of Penn.*, 673 F.3d 1240 (9th Cir. 2012) (recognizing district court's general discretion under Rule 37 to impose discovery sanctions includes the right to bar evidence from use in the case).

Because Remaining Plaintiff should not be allowed to provide contradictory evidence as sanction for her failure to appear at her deposition and provide requested financial and tax information, and because the evidence previously adduced and cited herein indisputably demonstrate Remaining Plaintiff was not an employee of Defendants, the Court must enter judgment in Defendants' favor and dismiss all claims.

## III. CONCLUSION

For these reasons, performers at Lé Girls are properly considered as licensees, per their agreement with the Club, and Plaintiff has not established that the Court should proceed in this matter regarding individual claimants as employees.

DATED this 24th day of July, 2020.

BUCHALTER

By: /s/ Laurent R.G. Badoux
Laurent R.G. Badoux
*Attorneys for Defendants*

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants, and mailed a copy of same to the following if non-registrants, this 24th day of July, 2020, to:

Jane Roe Dancer 2, *in pro se*
929 W. Bartlett Avenue
Las Vegas, NV 89106

*/s/ Laurent Badoux*

BN 41362493v2